IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KEVIN SNEED, JR., | * | |
|     Plaintiff, | * | |
| v. | * | Civil Action No. 8:20-cv-00412-PX |
| WILLIAM PATRICK COMPOY BANKHEAD, *et al.*, | * | |
|     Defendants. | * | |
| | *** | |

## MEMORANDUM OPINION

This action arises from a traffic stop that took place in 2017. Plaintiff Kevin Sneed, Jr. was the driver of the vehicle, and Defendants William Patrick Compoy Bankhead ("Officer Bankhead") and William Windsor ("Officer Windsor") were the Prince George's County police officers who effectuated the stop. Sneed asserts that Defendants violated his rights under the United States Constitution and Maryland Declaration of Rights by unlawfully arresting him and subjecting him to multiple instances of excessive force. Pending before the Court is Defendants' motion for partial summary judgment. *See* ECF No. 34. The issues are fully briefed, and no hearing is necessary to resolve this motion. *See* D. Md. Loc. R. 105.6. For the following reasons, the motion is DENIED.

**I.   BACKGROUND**[1]

On the afternoon of May 26, 2017, Sneed was driving a Chevrolet Suburban along Brinkley Road in Prince George's County, Maryland. *See* ECF No. 34-3 at 2–3. Also in the vehicle were Barry Blaine ("Blaine"), William Petite ("Petite"), and two other unidentified

---

[1] Unless otherwise noted, the following facts are undisputed and construed most favorably to Sneed as the non-moving party. *See News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010); *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 364 n.3 (D. Md. 2011).

passengers.  *See* ECF No. 34-2 at 8; ECF No. 35-2 at 3.  Sneed eventually drove into the parking lot of the Brinkley Market, stopping the car at the edge of the lot as if he did not intend to stay long.  *See* ECF No. 34-3 at 3.  The two unidentified passengers exited the vehicle and Sneed put the car in park.  *See* ECF No. 35-2 at 3–4.

Officer Bankhead was driving his marked police cruiser in the vicinity.  ECF No. 35-6 at 5.  At that time, Officer Bankhead was assigned to the police department's District IV Station Special Assignment Team.  *Id.* at 3.  The team's officers are expected to target "street-level drug dealing and . . . street-level violent crimes."  *Id.*  To that end, Officer Bankhead was patrolling the area "to prevent further robberies" after an establishment had been robbed the night before.  *Id.* at 4.  Officer Bankhead observed Sneed enter the parking lot and drop off the two passengers.  *See id.* at 5, 7–8.  He situated his cruiser in a parking space such that he could watch Sneed's vehicle through the rearview mirror.  *Id.* at 8.  He noticed that the taillights on Sneed's vehicle were "inoperable."  *Id.*  After the two passengers left the car, Officer Bankhead backed out of the parking space, activated his lights and siren, and pulled up directly behind Sneed's vehicle.  *Id.* at 9.  Sneed was sitting in the driver's seat, Blaine in the front passenger seat, and Petite in the backseat directly behind Sneed.  *See* ECF No. 35-2 at 4; ECF No. 35-3 at 4.  The vehicle's doors were closed, but the windows were rolled down, as it was warm outside.  *See* ECF No. 34-4 at 6; ECF No. 35-3 at 6.

As Officer Bankhead approached the driver's side of the car, he observed that the windshield was cracked.  ECF No. 34-3 at 6.  Officer Bankhead placed his hand on his service weapon which was holstered yet "already unbuckled."  *See* ECF No. 35-3 at 5.  At the same time, Officer Jerald Greenwood, whom Officer Bankhead had called as backup, approached the passenger side.  *See* ECF No. 35-6 at 15.

2

Sneed, Blaine, and Petite—all young, black men—describe feeling very anxious as the officers approached the car. "Officers profile black men," Sneed believes, "and usually, in situations like that, they die." ECF No. 35-4 at 24. Petite echoed, "We were scared . . . you got to think, we are young black men in America . . . [w]e know what goes on with police these days." ECF No. 35-3 at 11.

When he got to the car, Officer Bankhead asked about the "broken tail light and a cracked windshield" and requested Sneed's license and registration. *See* ECF No. 34-2 at 9; ECF No. 34-3 at 6. Officer Bankhead attests that Sneed "pulled his wallet out, opened it up, then closed it and returned it to his pocket, stating he didn't have his license." ECF No. 34-3 at 8. Sneed had only a learner's permit. *See* ECF No. 35-6 at 39. Officer Bankhead also asked Sneed if he had a gun, and he ordered Sneed to get out of the car. *See* ECF No. 35-4 at 2; ECF No. 35-6 at 16–18.

Sneed, in response, asked if this was all "for a broken tail light," which angered Officer Bankhead. ECF No. 35-4 at 2–3. Bankhead immediately "jumped in the car" and attempted to snatch the keys from the ignition while he hit Sneed. *Id.* at 3. During the fracas inside the car, one of the men bumped the gearshift, causing the car to roll forward.[2] *See* ECF 35-2 at 3–5; ECF No. 35-2 at 4 (Blaine, seated next to Sneed, describes that Officer Bankhead "jumped inside the vehicle to take the key out [of] the ignition, and the motion of him jumping in the window" caused the gearshift to shift into drive). The car rolled onto Brinkley Road and, once it came to a stop, the officers immediately pulled Sneed out and began to beat him as he lay on the ground, facing the pavement. *See* ECF No. 35-6 at 23–25. Officer Bankhead justifies the beating as the

---

[2] On this point, the testimony diverges. Officer Bankhead recalls that Sneed inexplicably "started the vehicle back up" and "then put the vehicle into drive." ECF No. 35-6 at 19–20. Petite, who was sitting in the backseat, similarly recalls that "Mr. Sneed got scared. He tried to pull off." ECF No. 35-3 at 5.

product of "an emergency situation" because, according to him, Sneed refused to comply with police orders and resisted arrest. *See id.* at 33.

Sneed recounts that Officers Bankhead and Windsor "yanked" him out of the car and "jumped" him; they hit and punched him in the face, head, and knees as he lay on the ground. ECF No. 35-4 at 4, 7. To this day, Sneed has bald patches where officers pulled dreadlocks out of his head. *Id.* at 7. Officer Bankhead specifically admits that the purpose of the beating was for Sneed to acquiesce through "pain compliance." ECF No. 35-6 at 28. Officer Windsor, Sneed believes, also said he should kill Sneed for trying "to kill an officer." ECF No. 35-4 at 4. Backup officers drew their guns on Blaine and Petite, who were still seated in the car. *See* ECF No. 35-2 at 7; ECF No. 35-3 at 9. One officer put a gun to Blaine's head threatened to kill him. *See* ECF No. 35-2 at 4.

Eventually, Sneed was charged in Prince George's County Circuit Court with 15 separate criminal charges including first- and second-degree assault, resisting arrest, disturbing the public peace, and three related firearms charges—even though the officers located *no weapons* at the scene. *See* ECF No. 35-5 at 3–4; ECF No. 35-6 at 41. Eleven of the 15 original charges were dropped before trial. As to the remaining four charges—first-degree assault, second-degree assault, resisting arrest, and disturbing the public peace—a jury acquitted Sneed completely. *See* ECF No. 35-5 at 3.

Thereafter, Sneed filed a thirteen-count civil Complaint in Prince George's County Circuit Court, alleging that Officers Bankhead and Windsor violated his state and federal constitutional rights by using excessive force and falsely arresting him. *See* ECF No. 3. Sneed also sued Prince George's County, alleging liability arising from a pattern and practice of unconstitutional conduct, as well as state negligence claims and vicarious liability for the

4

officers' conduct. At the close of discovery, Defendants moved for summary judgment on all but the excessive force claims against the individual officers. *See* ECF No. 34. In response, Sneed voluntarily dismissed several claims, but he vigorously opposed summary judgment as to the false arrest claim.[3] *See* ECF No. 35. For the reasons discussed below, the Court agrees with Sneed and will deny the motion.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when the Court, construing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party, finds no genuine dispute exists as to any material fact, thereby entitling the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011). "[A] court is not entitled to either weigh the evidence or make credibility determinations" at the summary judgment stage. *In re French*, 499 F.3d 345, 352 (4th Cir. 2007). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)) (alteration in original). Genuine disputes of material fact are not created "through mere speculation or the building of one inference upon another." *Othentec Ltd.*

---

[3] Counts VII, VIII, IX, X, XI, and XIII are therefore DISMISSED with PREJUDICE as to all Defendants. *See* ECF No. 35 at 3 ("Mr. Sneed concedes that Counts VII, VIII, IX, X, XI, XIII, and XIV [sic] should be dismissed with prejudice."). In his responsive brief, Sneed also clarified the scope of his vicarious liability claim against Prince George's County (Count XII). It appears from Defendants' reply brief that Defendants no longer seek judgment as to this claim. *See* ECF No. 37 at 2.

*v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

**III. ANALYSIS**

Sneed pursues his federal constitutional claims under 42 U.S.C. § 1983. Section 1983 imposes liability on anyone who, acting under color of state law, deprives a person of any 'rights, privileges, or immunities secured by the Constitution and laws.'" *Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 210 (4th Cir. 2007) (quoting 42 U.S.C. § 1983). To maintain a § 1983 action, a plaintiff must demonstrate "that the charged state actor (1) deprived plaintiff of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was performed under color of the referenced sources of state law found in the statute." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

Generally, the Fourth Amendment protects citizens "against unreasonable searches and seizures" by government authorities. U.S. Const. amend. IV.[4] Defendants argue that no evidence supports Sneed's unconstitutional seizure claim. In the context of traffic stops, a driver is considered lawfully "seized" where the officer possesses reasonable, articulable suspicion that criminal activity is afoot. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968) ("[T]he police officer must be able to point to specific and articulable facts" which warrant intrusion into an individual's liberty); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 110–11 (applying *Terry*'s rationale to routine traffic stops). A warrantless *arrest* may flow from a lawful traffic stop where the officer

---

[4] Although this discussion focuses on the Fourth Amendment to the United States Constitution, the Court of Appeals of Maryland has indicated that Article 26 of the Maryland Declaration of Rights affords the same protections as the Fourth Amendment. *See Byndloss v. State*, 391 Md. 462, 465 n.1 (2006) ("Article 26 of the Maryland Declaration of Rights is, generally, *in pari materia* with the Fourth Amendment of the United States Constitution."); *see also Carter v. State*, 236 Md. App. 456, 467 (2018) ("The Court of Appeals has generally interpreted Article 26 of the Maryland Declaration of Rights to provide the same protections as the Fourth Amendment.").

6

has probable cause to believe that the suspect has committed a crime for which arrest is permissible. *See Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 460 (4th Cir. 2013).

The parties do not dispute that Sneed had been "seized" under the Fourth Amendment from the moment Officer Bankhead approached the vehicle. *See Brendlin v. California*, 551 U.S. 249, 251 (2007) ("When a police officer makes a traffic stop, the driver of the car is seized within the meaning of the Fourth Amendment."). Nor do they dispute that Officer Bankhead initially had sufficient cause to approach Sneed arising from suspected traffic violations. *See* ECF No. 35 at 1 ("No one contends that the stop itself was invalid.").[5] Rather, Sneed rests his seizure claims first on Officer Bankhead's having ordered him out of the car and next on having been beaten and arrested for baseless criminal charges. *See* ECF No. 35 at 13, 16.

Defendants urge that the seizure claim premised on Officer Bankhead's ordering Sneed out of the car fails as a matter of law. ECF No. 37 at 2. Defendants are correct. Once an officer effectuates a lawful traffic stop, the officer may order the driver out of their vehicle as a matter of course. *Mimms*, 434 U.S. at 109–10. The Supreme Court has specifically reasoned that the minimal intrusion to individual freedom of movement pales in comparison to the "inordinate risk" that officers face in conducting traffic stops, even absent any specific facts suggesting the driver poses a danger. *Id.* at 109–11; *see also Maryland v. Wilson*, 519 U.S. 408, 414–15 (1997)

---

[5] Oddly, Sneed seems to press that the stop itself was "pretextual" and so constitutes an unconstitutional seizure. *See* ECF No. 35 at 13 ("A reasonable jury can conclude that Officer Bankhead treated Kevin Sneed from the inception of the traffic stop as a robbery suspect . . . ."). As Defendants correctly point out, this theory of liability is squarely foreclosed. *See generally Whren v. United States*, 517 U.S. 806 (1996) (where evidence supplies sufficient reasonable suspicion that traffic violation occurred, it is irrelevant whether the particular stopping officer's personal reason for stopping the car was pretextual); *see also United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993) (Under the "purely objective standard," the "subjective motivations of the officers involved" are of no consequence). Because Officer Bankhead stopped and approached the car based on uncontroverted and objective evidence of a traffic violation—an inoperable taillight—any of his "true" motives are irrelevant. *See McDaniel v. Arnold*, 898 F. Supp. 2d 809, 835 (D. Md. 2012) ("[A]n officer who observes a suspected traffic violation may effect a traffic stop, even if the officer's subjective motivation for the stop is not the traffic violation itself, but the hope that the stop will lead to the discovery of evidence of some other crime."). Thus, the unlawful seizure claim cannot prevail based on the stop alone.

(extending *Mimms* to ordering passengers out of stopped vehicles). Because Officer Bankhead could lawfully execute the traffic stop, he likewise could order Sneed out of the car. The unlawful seizure claim, therefore, will not proceed on this basis.[6]

But the heart of Sneed's seizure claim lies in the swift beatdown he received once he was pulled from the car. *See* ECF No. 35 at 16–21. As Sneed underscores, Officer Bankhead had no probable cause for any criminal offense apart from minor traffic violations. *Id.* at 19. Yet indisputably, Sneed was subject to physical blows from Officer Bankhead and other officers, one of whom said he would "kill" Sneed. *See* ECF No. 35-4 at 4. From this, Sneed avers that he was arrested at the time he fell victim to the officers' beating. *See* ECF No. 35 at 15 ("The witnesses in the vehicle indicate that Officer Bankhead escalated the stop to a physical encounter, and *de facto* arrest . . . .").

Defendants nonetheless assert that the officers could lawfully seize Sneed in this manner because they had probable cause to believe Sneed had committed the offenses of assault, resisting arrest, and other related crimes. ECF No. 37 at 5 (arguing arrest was supported by "Sneed's subsequent criminal conduct committed in the presence of [Officer] Bankhead"). Although Defendants are correct that officers may execute a warrantless arrest when an individual commits a crime in the officer's presence, *see Longshore v. State*, 399 Md. 486, 501

---

[6] Nor is there any evidence that the investigation into the minor traffic offenses had ended at the time that Officer Bankhead ordered Sneed out of the car. If that were the case, any further detention would have been an unlawful seizure. *Cf. Rodriguez v. United States*, 575 U.S. 348 (2015) (holding that an officer may not prolong a traffic stop to conduct an unrelated investigation absent additional cause); *United States v. Green*, 740 F.3d 275, 279 (4th Cir. 2014) ("A lawful traffic stop begins when a vehicle is pulled over for investigation of a traffic violation and ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave.") (internal quotation marks omitted) (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)); *Berkemer v. McCarty*, 468 U.S. 420, 421 (1984) ("A traffic stop is usually brief, and the motorist expects that, while he may be given a citation, in the end he most likely will be allowed to continue on his way."). Indisputably, Officer Bankhead had reason to believe Sneed only possessed a learner's permit at the time he ordered Sneed out of the car, and so the reasonable articulable suspicion as to Sneed's having operated a vehicle without a license had not evaporated. *See* ECF No. 34-2 ("I told him that this was my woman's car at the time and that I had a learner's and my best friend had his license."). Thus, the order to exit the vehicle was lawful.

(2007), the Court cannot find as a matter of law that the charged felony offenses supported the officers' arrest. Indeed, if the trier-of-fact believes the testimony that Officer Bankhead "jumped in the car and immediately reached for the keys while striking" Sneed, then Sneed was seized before he was even out of the car. *See* ECF No. 35-4 at 3; *see also* ECF No. 35-2 at 7 (Officer Bankhead "asked [Sneed] for his license. [Sneed] was attempting to get his wallet, and the officer jumped through the window, started punching him, and as he [sic] punching him, his elbow hit the gearshift . . . .").

Similarly, a reasonable trier-of-fact may wholly reject that any probable cause existed to arrest Sneed for the charged offenses. Officer Bankhead admitted that he beat Sneed to achieve "pain compliance." ECF No. 35-6 at 28. Sneed describes that these efforts at pain compliance were remarkably brutal—he was threatened with death and punched about the face, head, and knees, and had the hair ripped out from his scalp. All the while, Sneed laid on the ground defenseless. If Sneed's testimony is believed, then he had committed no acts which would provide probable cause for any charged offense. On this point, Sneed's acquittal of all charges—a verdict strongly suggesting that the officers were not believed—means the same claims here could be likewise rejected at trial. Because sufficient evidence supports that these officers had no basis to arrest Sneed, let alone beat him as they did, the unlawful seizure claim must proceed to trial.

Defendants also attempt to justify the arrest because Sneed purportedly refused Officer Bankhead's orders when he "allowed or caused his vehicle to move . . . into Brinkley Road." ECF No. 37 at 6. This proposition is not at all clear from the record. Indeed, a reasonable trier-of-fact could conclude that the car moved through no fault of Sneed's, but rather because Officer Bankhead reached into the vehicle to snatch the keys. *See* ECF No. 35-4 at 2 ("When I said, 'For

a tail light -- for a broken tail light?,' [Officer Bankhead] got angry and he jumped into the car and reached for the keys and started striking me."). Stated otherwise, a reasonable juror could find incredible that the officers would view the rolling car as sufficient probable cause to justify Sneed's arrest. The unlawful seizure claim thus proceeds on this ground.

Lastly, the Court addresses Defendants' contention that qualified immunity shields the officers from liability on the seizure claim. ECF No. 34-1 at 13. An officer enjoys the defense of qualified immunity when his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McDaniel v. Arnold*, 898 F. Supp. 2d 809, 831–32 (D. Md. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity requires the officer to demonstrate either that he did not violate the constitutional rights of the plaintiff, or that if he did, no clearly established law exists such that he would have known his conduct to be unlawful. *See id.* at 832.

When viewing the evidence most favorably to Sneed, the Court cannot find that the officers enjoy qualified immunity on the seizure claim. If the trier-of-fact believes the lay witnesses—that Officers Bankhead and Windsor delivered a severe beatdown to effectuate an arrest without probable cause—then the seizure in all likelihood amounted to a clearly established constitutional violation. But this all remains to be seen at trial. For now, the motion for judgment on qualified immunity grounds will be denied.[7]

---

[7] As to Sneed's claims under the Maryland Declaration of Rights, no qualified immunity defense is available. *See Meyers v. Baltimore County*, 981 F. Supp. 2d 422, 430 (D. Md. 2013) ("[Q]ualified immunity is not a defense to an excessive force claim brought under Articles 24 and 26 of the Maryland Declaration of Rights."); *see also Williams v. Prince George's County*, 112 Md. App. 526, 546 (1996) ("In Maryland, qualified immunity does not apply to constitutional claims."). Maryland courts have repeatedly held that qualified immunity cannot be asserted as a defense to violations of Articles 24 and 26 of the Maryland Declaration of Rights. *See, e.g.*, *Prince George's County v. Longtin*, 190 Md. App. 97, 130–31 (2010), *aff'd*, 419 Md. 450 (2011) (describing the "almost uniquely expansive reach of Maryland's constitutional tort remedy, where no official or local governmental immunity is possible"); *Okwa v. Harper*, 360 Md. 161, 201 (2000) ("A state public official alleged to have violated Article 24, or any article of the Maryland Declaration of Rights, is not entitled to qualified immunity."); *Ritchie v. Donnelly*, 324 Md. 344, 374 (1991) ("[T]he state official who violates a plaintiff's constitutional right is personally

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is DENIED. By stipulation of the parties, Counts VII, VIII, IX, X, XI, and XIII are DISMISSED with PREJUDICE. *See* ECF No. 35 at 3; ECF No. 37 at 2. The remaining counts will proceed to a jury trial.

A separate Order follows.

| | |
|---|---|
| January 13, 2022 | /s/ |
| Date | Paula Xinis |
| | United States District Judge |

---

liable . . . and, in the absence of statute, does not have the qualified immunity defense available in a § 1983 action.").